FILED

2009 Dec-30  PM 03:20
U.S. DISTRICT COURT
N.D. OF ALABAMA

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| FRANK BLANKENSHIP, | } | |
| | } | |
| Plaintiff and | } | |
| counter-defendant, | } | CIVIL ACTION NO. |
| | } | 08-AR-0639-S |
| v. | } | |
| | } | |
| METROPOLITAN LIFE INSURANCE | } | |
| COMPANY, | } | |
| | } | |
| Defendant and | } | |
| counterclaimant. | } | |

**MEMORANDUM OPINION**

Plaintiff, Frank Blankenship ("Blankenship"), invoking 29 U.S.C. § 1132, the enforcement provision of the Employee Retirement Income Security Act of 1974 ("ERISA"), claims that he has been wrongfully denied long-term disability ("LTD") benefits by defendant, Metropolitan Life Insurance Company ("MetLife"). MetLife counterclaims, seeking to offset benefits paid to Blankenship by any Social Security Disability Income ("SSDI") received by him. Before the court are Blankenship's and MetLife's cross-motions for judgment as a matter of law. Based on the administrative record ("AR") (as expanded by the fact that the Social Security Administration granted Blankenship SSDI after MetLife's denial), the briefs and oral argument, and for the reasons given below, Blankenship's motion will be granted insofar as it seeks LTD benefits and denied insofar as it seeks to avoid any SSDI offset, and MetLife's motion will be denied insofar as it pertains to its

denial of benefits, but granted insofar as it seeks an offset for SSDI.

## The Pertinent Facts

Blankenship worked for Sears, Roebuck and Co. ("Sears") as a store manager, and was a participant in the Sears Group Long-Term Disability Plan ("the Plan"). The Plan is governed by ERISA, 29 U.S.C. §§ 1001-1461 (2006). MetLife is not only the administrator of claims but also the funding source. The Plan vests MetLife with discretionary authority both to interpret the Plan and to determine whether a claimant is disabled under the terms of the Plan. (AR - 32). The Plan has two methods or standards for determining eligibility for benefits: (1) a claimant is disabled during the first two years after a claim is made if he is unable to perform the duties of his "Own Occupation", and as a result is unable to earn more than 80% of his pre-disability earnings; and (2) after the said two-year period a claimant is disabled if, due to his inability to perform "any gainful occupation for which [he] is reasonably qualified" ("Any Occupation"), he is unable to earn more than 60% of his pre-disability earnings. The Plan also provides that benefits will be reduced by "Other Income Benefits", including SSDI. (AR - 14).

In May 2003, Blankenship was diagnosed with coronary artery disease, and it was discovered that he had a 99% blockage of one coronary artery and between 10% and 30% blockage of two others. (AR

- 804). The main blockage was treated with a stent on May 9, 2003 (AR - 804). On August 23, 2003, Blankenship suffered a heart attack. (AR - 826). After his attack, Blankenship was treated by several physicians. His primary physician was Dr. Frank Rudeseal, but he was also monitored by several cardiologists, including Drs. Michael McKinney, Michael Honan, and Paschal Redding. (AR - 686, 486). Immediately following his attack, Blankenship was approved by MetLife for short-term disability benefits. (AR - 170). When his short-term benefits expired in January 2004, he applied for LTD benefits under the Plan. (AR - 691-92). In connection with his application, Blankenship submitted a report from Dr. Rudeseal stating that he should not return to work because he was "unable to tolerate stress and long hours." (AR - 673). Blankenship also submitted a report from Dr. Redding stating that he was fit to work zero (0) hours per day, and "ha[d] angina with stressful situations and exercise." (AR - 676). MetLife does not deny that managing a large Sears store is a stressful, if a well paid, occupation.

On February 17, 2004, MetLife denied Blankenship's application for LTD benefits without giving much of an explanation. (AR - 181). However, MetLife continued to review Blankenship's application, and an entry in MetLife's Diary Review Reports dated March 5, 2004, notes that Blankenship "cannot work due to angina with stressful situations and exercise, ... is limited due to the severity of his cardiac condition," and that MetLife "would refer to SS [Social

3

Security]." (AR - 181, 183). This internal note, not shared with Blankenship, could only be interpreted as a precautionary note anticipating the real possibility that Blankenship was, in fact, entitled to LTD benefits, in which event MetLife would be entitled to set-off SSDI against its obligation. In an entry of March 10, 2004 in its Diary Review, MetLife found that because of Blankenship's "significant cardiac history" it was "unlikely [that Blankenship] will be able to RTW [return to work]." (AR - 183). On March 11, 2004, MetLife, for some then unarticulated reason, perhaps a tinge of conscience, reversed its earlier decision and approved Blankenship for LTD benefits as of January 12, 2004 under the Plan's "Own Occupation" standard. (AR - 231-233). On June 14, 2004, as he was required to do under the Plan in order to avoid having his LTD benefits reduced by the amount MetLife **estimated** he might have received had he applied for SSDI, Blankenship did, in fact, apply for SSDI and so notified MetLife. (AR - 186).  On October 7, 2004, Blankenship's application for SSDI was denied. (AR - 605-611).

On December 22, 2004, MetLife informed Blankenship that it was terminating his benefits under the "Own Occupation" standard based on the records available. (AR - 582-85). One of these records, conspicuously not referenced by MetLife, was the SSDI denial. MetLife's denial letter to Blankenship stated, *inter alia*, that "there is no **objective** medical [evidence] on file to support

4

a disability." (AR - 584)(emphasis added).

In compliance with the Plan's procedure, Blankenship appealed MetLife's decision, and in connection with his appeal submitted letters from Drs. Redding and Rudeseal. Dr. Rudeseal therein stated that "[a]ny stress related situation could cause Mr. Blankenship's cardiac symptoms to worsen," and that Blankenship "cannot return to work." (AR - 560). Dr. Redding wrote that Blankenship "is unable to return to a situation of stressful management," and that "he is approaching 100% disability because of his inability to function ... in stressful situations." (AR - 577-78). As part of the appeal process, MetLife submitted Blankenship's file to an "independent" internist and cardiologist, Dr. Mark J. Friedman, for review. Dr. Friedman did not conduct a physical exam. Based only on the file, he concluded that Blankenship's "moderate coronary artery disease should allow Mr. Blankenship to perform a light duty work situation." (AR - 569). Acting on Dr. Friedman's finding, MetLife denied Blankenship's appeal on February 11, 2005. (AR - 564).

On February 21, 2005, Blankenship had knee surgery to repair a left knee meniscus that had been torn approximately three weeks earlier. (AR - 437-38). On April 1, 2005, MetLife reinstated Blankenship's LTD benefits under the "Own Occupation" standard based on his knee surgery and his expected period of rehabilitation. (AR - 195-99). On July 29, 2005, MetLife sent

Blankenship a letter informing him that as of January 12, 2006, he must be disabled under the second, "Any Occupation" standard in order to be eligible for further LTD benefits. (AR - 450-51). Although the April 1, 2005, grant of benefits was purportedly based only on Blankenship's knee surgery, MetLife continued to seek information about Blankenship's heart condition. In response to a request from MetLife sent on July 29, 2005, Dr. Rudeseal submitted a form in which he reiterated that Blankenship was permanently disabled and would never be capable of engaging in a gainful occupation because he "can't handle stress with [his] heart condition." (AR - 452-54). In response to another MetLife request sent the same day, Dr. Michael Honan, another Blankenship cardiologist, filled out a form for MetLife in which he stated that Blankenship's condition was permanent and that he was not capable of performing any gainful employment due to "CAD [coronary artery disease] precipitated by stressful situations". (AR - 468).

    In its active, continuing review of Blankenship's claim, MetLife also requested a report from an "independent" Vocational Rehabilitation Consultant employed by it. (AR - 347-48). MetLife conspicuously did not mention to its said consultant Blankenship's heart condition. *Id.* at 347. Instead, it submitted only the report of Blankenship's orthopedic surgeon. *Id.* Understandably, the answering report from the vocational expert, received by MetLife on December 9, 2005, did not mention or evaluate Blankenship's heart

condition or speak to any relation that stress has upon his ability to work or earn. *Id.* Based solely on potential work restrictions related to the knee problems, the paid consultant identified three occupations, all arguably stressful, in which, in the consultant's opinion, Blankenship could earn more than 60% of his pre-disability earnings. *Id.* at 348. The vocational expert was working with the 60% figure when she concluded, without considering stress, that Blankenship could earn more than that with his knee problem.

In an elaborate letter of January 5, 2006, MetLife informed Blankenship that as of January 12, 2006, he would no longer be eligible for LTD benefits. (AR - 343-45). Blankenship again appealed. As part of the new appeals process, MetLife employed yet another cardiologist, this time Dr. Michael Rosenberg, to conduct a review of Blankenship's file. (AR - 310-14). Like the earlier review by Dr. Friedman, Dr. Rosenberg conducted only a file review, performing no physical exam. *Id.* Unlike the vocational rehabilitation report, Dr. Rosenberg's report did mention Blankenship's cardiac condition. *Id.* However, Dr. Rosenberg was not asked about, and did not discuss, the relationship, if any, between Blankenship's condition and stress in the workplace. *Id.* Based only on his file review, and in response to specific and carefully worded questions by MetLife, Dr. Rosenberg found that Blankenship could do "sedentary, light or medium work." *Id.* "Sedentary, light, or medium work", of course, might or might not be so stressful as

to preclude performing it. In connection with the appeal, MetLife also consulted an orthopedic surgeon. (AR - 296-300). In a letter dated August 18, 2006, MetLife upheld its decision to deny Blankenship LTD benefits. *Id.* This final letter categorically informed Blankenship that he had exhausted his appeals. *Id.*

In July 2007, nearly a year after MetLife made its final decision, the Social Security Administration reversed its earlier decision and found that Blankenship had become fully disabled as of August 23, 2003, the date of his heart attack. The Social Security Administration awarded Blankenship all claimed SSDI, including past-due benefits of $84,021.50. (AR - 294-95). This SSDI decision was based both on Blankenship's coronary artery disease and on his degenerative joint disease of the knees. *Id.* MetLife thereafter made no demand on Blankenship for its alleged share of these retroactively awarded SSDI benefits, that is, until it filed its counterclaim after this action was filed on April 11, 2008.

After the judge to whom this case was originally assigned recused, the case was reassigned to the undersigned.

### The ERISA Framework

This court has not been coy in expressing its disappointment with the federal courts, including the Supreme Court of the United States, for failing to take Congress at its word when Congress enacted the provisions in ERISA that, on their face, guarantee the right of any beneficiary of an ERISA disability plan to file suit

in a United States District Court to recover the benefits he claims have been wrongfully denied him. This disappointment is shared by many courts, law professors and litigants. See, in particular, the unanswered *amici curiae* briefs filed in support of respondent in *Metropolitan Life Ins. Co. v. Glenn*, ____ U.S. ____; 128 S.Ct. 2343 (2008). Instead of recognizing the patently obvious Congressional intent, the ERISA courts have contrived ersatz administrative procedures, with an inlay of trust law, for the judicial review of denials of ERISA benefits. This court has learned to live with its disappointment. In other words, this court fully recognizes that it is bound to examine any ERISA disability claim in compliance with the directions from the appellate courts that have pronounced on the subject and that are binding on this court.  There are still, of course, enough murky areas to make this task daunting.

Counsel for Blankenship and counsel for MetLife are unusually sophisticated and knowledgeable lawyers who regularly handle ERISA litigation.  Therefore, they have both employed the words "**motion for judgment as a matter of law**" to describe their cross-motions. These words nowhere appear in the Federal Rules of Civil Procedure. The parties conspicuously do not invoke Rule 56, F.R.Civ.P., and do not use the classic words, "motion for summary judgment".  Most federal courts, both at the trial level and at the appellate level, persistently employ, and/or refer to, Rule 56 as the device for resolving ERISA disputes.  In **non**-ERISA cases in which either a

9

defendant or a plaintiff files a Rule 56 motion and the court finds that the movant is not entitled to judgment as a matter of law on undisputed facts, the court routinely stamps the motion "DENIED", and the case proceeds to a trial on the merits.  But, in an ERISA benefits case, unless there is a local federal court rule that sets up, or purports to set up, a separate, special procedure for ERISA cases (as is true in many district courts but not in the Northern District of Alabama), when a party files a Rule 56 motion, this cannot happen. If a court simply stamps such a motion "DENIED", it creates consternation.  As recently as September 28, 2009, the Northern District of Illinois, in response to cross-motions for summary judgment in an ERISA disability case, found "that there are genuine issues of material fact surrounding Hintz's disability status and the parties' **cross-motions for summary judgment therefore must be denied**". *Hintz v. The Prudential Insurance Co. of America*, _____ F. Supp. 2d _____, No. 08-1444, 2009 WL 3156741, at *24 (N.D. Ill. Sep. 28, 2009)(emphasis added).  This court will not try to guess what the Illinois trial court judge will do next in *Hintz.* Will he expand the record by listening to and cross-examining live witnesses, whose written conflicting opinions were before him when he conducted his Rule 56 analysis? If he does so, he will be stumbling into a trial on the merits that this court believes Congress intended but that the Supreme Court has denied. And, will any further inquiry in *Hintz* include evidence on the

**degree** and **effect** of the inevitable, built-in conflict-of-interest by the insurance company?

This court knows from experience that, under ERISA, trial courts, despite never having seen a live witness, routinely make, or purport to make, credibility determinations to resolve disputes between irreconcilable unsworn written testimony. It would, of course, constitute a Rule 11 violation for an ERISA beneficiary to file an action seeking to recover benefits without having any evidentiary support whatsoever for his claim. On the other hand, a plan administrator can always be counted on to say that it relied, in reaching its decision, upon evidence that predictably contradicts the evidence offered by the beneficiary. Otherwise, there would be no dispute, and no federal court involvement. Rule 56 simply does not fit an ERISA case. This is why the parties in the above-entitled case appropriately adopt the innovative "motion for judgment as a matter of law", arrived at by adapting procedures from administrative law. Even Dr. Watson, without Sherlock's help, could deduce from this procedural dilemma either that a new procedural rule should be created for ERISA cases, or that ERISA should be applied as it was written by Congress.

After this case was reassigned to the undersigned, an event that took place after the previously assigned judge had denied Blankenship's request to conduct discovery for the purpose of exploring the depth and breadth of MetLife's structural conflict-

of-interest, this court invited Blankenship to seek a reconsideration of the discovery issue, and/or to request a remand of the case to the plan administrator for MetLife's reconsideration of Blankenship's LTD claim in light of the Social Security Administration's granting SSDI after MetLife had denied LTD benefits and after Blankenship had exhausted his administrative remedies with MetLife. Blankenship happily declined both of the court's invitations, avoiding for the court some sticky, if provocative, questions. There is, for instance, a substantial string of cases decided after *Glenn*, in which claimants have been permitted to engage in discovery beyond the mere irrefutable conflict that always exists when the decision-maker is "coming out-of-pocket".  In light of this inherent conflict, acknowledged by the Supreme Court in *Glenn*, this court fails to comprehend how the Eleventh Circuit in *White v. Coca-Cola Co.*, 542 F.3d 848 (11th Cir. 2008) concluded that the "[benefits] committee [for Coca-Cola] does not operate under a conflict-of-interest", *id.* at 858, especially when, after *White* was decided, the same court in *Oliver v. Coca-Cola Co.*, 546 F.3d 1353 (11th Cir. 2008), held that "[t]hough such a conflict was found not to be present in *White*, *Oliver* might be able [on remand to this court] to **provide evidence** of one."  *Id.* at 1354 (emphasis added). What the Eleventh Circuit is saying in *Oliver* is more than a reflection upon a theoretical possibility. It is an invitation for the plaintiff in *Oliver* to explore the extent

12

to which Coca-Cola's structural conflict-of-interest, something denied in *White,* may affect or infect its decision. There would be no realistic way for the plaintiff in *Oliver* to "provide" to any court "evidence" of a conflict without obtaining and relying upon extrinsic evidence, evidence beyond the cold administrative record. The Eleventh Circuit appears, then, to understand *Glenn* to allow discovery beyond the bare existence of the conflict and to explore the level of that conflict and the degree to which it may have influenced the denial decision. Incidentally, it is not surprising that there are no reported ERISA cases in which the **funding party**, who theoretically could be adversely affected by an administrator's decision to **grant** benefits, has used the judicially created ERISA review procedure to challenge a granting of benefits. It is only plan **beneficiaries** who must worry about a decision-maker's conflict-of-interest and who must go to court to prove both the existence of the conflict and its adverse influence on a denial decision.

There are a growing number of cases that recognize limited discovery to bring to light evidence not in the administrative record, such as procedural defects, special or repeated relationships between experts and administrators, the amount of compensation paid to employed consultants, statistical records reflecting the percentages of claims granted and denied, etc. Such evidence could be very helpful to a court charged with the great

responsibility imposed upon it by *Glenn*. Here is a list of some of these recent cases: *Garvey v. Piper Rudnick LLP Long Term Disability Insurance Plan*, ____ F.R.D. ____, No. 08-1093, 2009 WL 3260010 (N.D. Ill. Oct. 9, 2009); *Taylor v. SmithKline Beecham Corp.*, 629 F. Supp. 2d 1032 (C.D. Cal. 2009); *Santos v. Quebecor World Longer Term Disability Plan*, 254 F.R.D. 643 (E.D. Cal. 2009); *Bartholomew v. UNUM Life Ins. Co.*, 579 F. Supp. 2d 1339 (W.D. Wash. 2008); *Samples v. First Health Group Corp.*, 631 F. Supp. 2d 1174 (D. Ariz. 2007); *Slusarski v. Life Insurance Co. of North America*, 632 F. Supp. 2d 159 (D.R.I. 2009); *Minton v. Deloitte and Touche USA LLP Plan*, 631 F. Supp. 2d 1213 (N.D. Cal. 2009); *Walker v. Metropolitan Life Ins. Co.*, 585 F. Supp. 2d 1167 (N.D. Cal. 2008); *Fowler v. AETNA Life Ins. Co.*, 615 F. Supp. 2d 1130 (N.D. Cal. 2009); *Hays v. Provident Life and Accident Ins. Co.*, 623 F. Supp. 2d 840 (E.D. Ky. 2008); *McQueen v. Life Ins. Co. of North America*, 595 F. Supp. 2d 752 (E.D. Ky. 2009); *Gessling v. Group Long Term Disability Plan*, 639 F. Supp. 2d 947 (S.D. Ind. 2009); *Denmark v. Liberty Life Assurance Co.*, 566 F.3d 1 (1st Cir. 2009). Exactly where these cases, and others like them, will ultimately lead, as the appellate courts come to grips with the enigmatic *Glenn* instruction, remains to be seen. At least in the instant case, this court has been spared any need to conduct an evidentiary inquiry beyond the evidence now before it. This court must, on that evidence, decide whether MetLife's admitted conflict-of-interest is

14

enough to demonstrate an abuse of discretion. The court must, with Blankenship's pointers, and with MetLife's stout resistance, connect whatever dots it can find.

### Was MetLife's Denial Arbitrary and Capricious?

As noted, the Supreme Court's instruction in *Glenn* has sparked a new round of struggles with the ERISA review framework. In *Glenn,* the Supreme Court reviewed the Sixth Circuit's finding that MetLife, as administrator of the self-same Sears LTD plan at issue here, abused its discretion when it denied benefits. *Glenn*, 128 S.Ct. at 2347. In upholding the Sixth Circuit, the Supreme Court ruled definitively, and without blinking, that when the administrator of an ERISA plan both determines eligibility for benefits and must pay those benefits, the "dual role creates a conflict of interest." *Id.* at 2346. The Court, however, shortchanged the lower courts when it offered no concrete advice as to how to weigh this conflict, holding only that "a reviewing court should **consider** that conflict as a **factor** in determining whether the plan administrator has abused its discretion in denying benefits; and that the significance of the factor will depend on the circumstances of the particular case." *Id.* (emphasis added). This court is now faced with "the circumstances of Blankenship's particular case."

The Eleventh Circuit's most recent effort to understand *Glenn*

appears in *Doyle v. Liberty Life Assurance Co. of Boston,* 542 F.3d 1352 (11th Cir. 2008) ("*Doyle II*"). *Doyle II* discusses at some length the impact *Glenn* has had on ERISA case analysis, but, like *Glenn*, does not give specific instructions to its lower courts as to how to weigh an administrator's conflict-of-interest. *See Doyle II*, 542 F.3d at 1359-60. *Doyle II* **does**, however, make clear that under *Glenn* a conflicted administrator's denial of benefits is no longer to be reviewed under the old "heightened arbitrary and capricious" standard. *Id.* Instead, "a conflict of interest should merely be a factor for the district court to take into account when determining whether an administrator's decision was arbitrary and capricious." *Id.* at 1360. This is nothing more than a quotation from *Glenn*. It adds nothing substantive. Thus, an ERISA trial court within the Eleventh Circuit must still use the traditional "arbitrary and capricious" standard, while, at the same time, **considering** any conflict-of-interest as a **factor**.

In *Doyle II* the Eleventh Circuit also held, in light of *Glenn*, that the previous "burden shifting" scheme provided in *Brown v. Blue Cross & Blue Shield of Ala., Inc.*, 898 F.2d 1556 (11th Cir. 1990) must be abandoned, and that "the burden remains on the plaintiff to show the decision was arbitrary; it is not the defendant's burden to prove its decision was not tainted by self-interest." *Doyle II*, 542 F.3d at 1360. It is hard for this court to believe that any profit-driven entity obligated to pay benefits out

of its pocket is not to some degree "tainted by self-interest" when it makes a decision to grant or to deny, but this court is prepared to forget *Brown* and leap with the *Glenn* court beyond mere logic and human nature, and to engage in an examination of the clues in this case that lead to a decision whether or not MetLife's denial was arbitrary and capricious. As will be hereafter seen, the court finds that MetLife did, in fact, "abuse its discretion" (another way of stating the "arbitrary and capricious" standard), but not because anyone who is both his own judge and jury can ever really be expected to shed his humanity and miraculously become totally fair and objective, even to the point of deciding against himself. Some courts are still looking for perfection, but not this court.

In determining whether Blankenship has met his burden of proof, the court must give **some** weight to the mere fact of MetLife's admitted conflict-of-interest. It is "a factor" to be weighed, even if it should ultimately be found to be "light-as-a-feather". What effect did MetLife's conflict **actually** have here, under an examination of the entire record, developed under the complicated and expensive ERISA regime?  The seminal mandate from *Glenn*, namely, that courts must consider an administrator's structural conflict as one "factor", has left courts scrambling not only to decide how this "factor" should be, or can be, weighed in a particular case, but what additional evidence, if any, should be considered to evaluate this "factor". Is the fact of an inherent

conflict-of-interest the **only** "factor" to be weighed, with no special consideration given to other "evidence", and thus no extrinsic evidence allowed to prove or disprove the severity of the inherent conflict factor? If the mere existence of a conflict is a factor that can have different weights in different cases, it actually may be found to be **so** significant in a particular case that it alone satisfies the burden of proving that the administrator's decision was arbitrary and capricious. In such a case the conflict would, of course, not be "light-as-a-feather", but would be "as-heavy-as-lead". The inherent conflict can, then, be dispositive, in and of itself, in some cases.

The Seventh Circuit, in *Marrs v. Motorola, Inc.*, 577 F.3d 783, (7th Cir. 2009), sums up, as follows, the disagreement over how to interpret *Glenn*:

> There are two ways to read the majority opinion [in *Glenn*]. One, which tracks its language and has been echoed in opinions in this and other circuits, e.g. *Jenkins v. Price Waterhouse Long Term Disability Plan*, 564 F.3d 856, 861-62 (7th Cir. 2009); *Holland v. Int'l Paper Co. Retirement Plan*, 576 F.3d 240, 246-49 (5th Cir. 2009), makes the existence of a conflict of interest one factor out of many in determining reasonableness. That sounds like a balancing test in which unweighted factors mysteriously are weighed.

*Id.* at 788. The Seventh Circuit goes on to disagree with this way to interpret *Glenn*, and holds that the conflict-of-interest is a dynamic factor that must be given greater significance if the

circumstances show that the conflict was likely to have influenced the administrator. It expresses this belief as follows:

> If the circumstances indicate that probably the decision denying benefits was decisively influenced by the plan administrator's conflict of interest, it must be set aside, ... The *likelihood* that the conflict of interest influenced the decision is therefore the decisive consideration, ... It is thus not the existence of a conflict of interest–which is a given in almost all ERISA cases–but the *gravity* of the conflict, as inferred from the circumstances, that is critical.

*Id.* at 788-89 (emphasis in original).

As recently as yesterday, December 29, 2009, the Seventh Circuit decided *Majeski v. Metropolitan Life Ins. Co.*, No. 09-1930, (no other citation available), vacating a district court's finding that MetLife acted reasonably when it denied a claim for ERISA disability benefits.  The opinion covers the waterfront, but ends up by remanding the case to the trial court for it, in turn, to remand the dispute to MetLife for prolonged agony. *Majeski* is the last in a long line of cases, including *Glenn*, in which MetLife has been found to have abused its discretion.

Although this court reads *Doyle II* to allow the mere inherent conflict to be a factor that can either be overwhelming, or can tip the balance in a particular case, this court will examine the degree of MetLife's conflict in this case in order to determine how likely it was, and to what extent, the conflict influenced MetLife's decision.

Consistent with *Doyle II*, a mere conflict-of-interest is not

a "factor" that can be shoved under the rug, as some courts have done after *Glenn*. In light of *Doyle II*'s holding that it is the plaintiff's burden to prove that the decision was influenced by a conflict-of-interest, this court believes that a plaintiff should be allowed to produce evidence discovered after the action has been filed concerning the degree and effect of that inherent conflict. This is, in this case, an academic question.

MetLife's acknowledged conflict here is not as "light-as-a-feather" because the claim at issue involves over $510,000, not including future benefits. Even for a prosperous insurer, $510,000 is not a small sum, and it does not take an inferential leap beyond Dr. Watson's deductive ability to conclude that the prospect of paying out $510,000 had a substantial, if not a precisely measurable, effect on MetLife's decision to deny Blankenship's claim.

MetLife does not present any evidence of measures it took to prevent or to mitigate the effect of its structural conflict, and while under *Doyle II* it is not MetLife's burden to prove that it was **not** influenced by its conflict, given the fact that this court must give the conflict some weight, cerebration by the court is required. Even though problematic, it would have been helpful if MetLife could have presented evidence of amelioration. *See Denmark*, 566 F.3d at 10 ("In future cases, plan administrators, aware of *Glenn*, can be expected as a matter of course to document the

20

procedures used to prevent or mitigate the effect of structural conflicts.") MetLife simply argues, as in all cases, that it acted within the range of reasonableness. It has said the same thing in many cases in which courts have disagreed with it. Its argument, nonetheless, must be examined thoroughly and dispassionately. Exactly how any decision-maker, including a judge, burdened with a conflict-of-interest, can protect the parties from an outcome influenced by a predisposition, that is, without recusing and reassigning the matter to a disinterested decision-maker, is a provocative, if unanswerable, question.

Taking into consideration MetLife's understandable desire to avoid paying $510,000, this court examines the entire administrative record, looking for clues. The first such clue is found in MetLife's December 22, 2004 denial letter which cites a lack of "**objective** medical [evidence] on file to support a disability"(emphasis added), even though there is no requirement in the plan that "objective" evidence be submitted to support a claim. (AR - 584). Perhaps realizing that courts have been heavily critical of administrators who cite a lack of "objective" evidence as a basis for denying a claim when there is no "objectivity" requirement in the plan, MetLife conspicuously omits any reference to an alleged lack of "objective" evidence in its later correspondence. *See Oliver v. Coca-Cola Company*, 497 F.3d 1181, 1196-98 (11th Cir. 2007). However, attempting to retreat from its

aggressive initial use of the idea of "no objective evidence" does not suggest that MetLife's ultimate denial is any less an abuse of discretion. MetLife's self-serving first conclusion that there was no "objective evidence" reveals its mindset. Also, its said assertion was **objectively** wrong. Prior to MetLife's letter, Blankenship submitted reports from two separate treating physicians who categorically stated that their patient could not return to work because of his debilitating cardiac condition and its exacerbation by stress. (AR - 673, 676). If such evaluations by treating physicians do not constitute "objective medical evidence", this court cannot think of what would constitute "objective evidence". Perhaps a heart transplant would constitute "objective evidence", but, then again, it might prove that the patient, permanently on prednisone, is more capable of working than ever before.

The court finds it interesting, if not dispositively probative, that Blankenship applied for SSDI only after MetLife reminded him of his obligation to do so. Under the Plan, MetLife would reduce LTD benefits by MetLife's self-serving **"estimate"** of SSDI if Blankenship had not applied for it. It was shortly after the SSDI denial that MetLife joined the Social Security chorus and also denied disability benefits. Was this what MetLife was waiting for? What would MetLife have done if SSDI had been **awarded** by the Social Security Administration, that is, other than begin to

offset? MetLife now seeks to offset any benefits previously paid or to be paid by it by subtracting the amount of SSDI that was paid retroactively by the Social Security Administration from August 23, 2003, the date of Blankenship's heart attack, and in the future. MetLife may or may not have actually considered the SSDI rejection when it also rejected Blankenship's LTD claim, but MetLife makes no bones about its now intending to exploit Blankenship's post-denial success with the Social Security Administration. This is sort of like having its cake and eating it too. MetLife wants to take advantage of both SSDI decisions. The court has allowed the parties to expand the record to include the belated grant of SSDI. Both parties rely on it. It is open to debate as to whose ox is more badly gored by the Social Security Administration's change of heart.

Additional evidence that MetLife's denial was arbitrary and capricious comes from the fact that the doctors who conducted so-called "independent" reviews of Blankenship's disability status conducted only "pure paper" or "file" reviews, rather than physical examinations of Blankenship. These reviewing doctors, if not regularly on MetLife's payroll (something that might have been discovered by Blankenship, but was not), were obviously paid by MetLife.  Most hired hands don't go contrary to the boss's best interest. Paid experts, more often than not, are, in this court's experience, "predisposed" or "preconditioned".  Courts have

consistently expressed their skepticism of benefits administrators' reliance on pure paper medical reviews, and have often held that such reviews are evidence of a shallowness and transparency that is the essence of arbitrariness and capriciousness. *See Bennett v. Kemper Nat. Svcs., Inc.*, 514 F.3d 547, 554-55 (6th Cir. 2008); *Montour v. Hartford Life & Acc. Ins. Co.*,____ F.3d ____, No. 08-55803, 2009 WL 3856933, at *10 (9th Cir. Nov. 19, 2009). Although there is no concrete proof in this case of the frequency with which MetLife hired these particular peer reviewers, the Supreme Court in *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 832, 123 S.Ct. 1965 (2003), pointedly remarked that "physicians repeatedly retained by benefits plans may have an 'incentive to make a finding of 'not disabled' in order to save their employers money and preserve their own consulting arrangements.'" *Id.* (quoting *Regula v. Delta Family-Care Disability Survivorship Plan*, 266 F.3d 1130, 1143 (9th Cir. 2001)). Even without evidence bearing on the loyalties of these particular physicians, they could not be as totally unbiased as MetLife holds them out to be. The fact that MetLife relied on mere file reviews, especially when the reports are in direct conflict with opinions rendered by Blankenship's own treating physicians and with the Social Security Administration's ultimate, if belated, determination, are facts that weigh in favor of a finding that MetLife's denial decision was the culmination of a structurally conflicted process.

Another piece of strong evidence that the structural conflict adversely influenced MetLife in its decision-making process is the fact that when MetLife requested a report from its vocational rehabilitation consultant in December 2005, it failed to mention Blankenship's heart condition, instead allowing its consultant to base her report entirely on work restrictions related to Blankenship's knee surgery. Similarly, when MetLife later submitted Blankenship's file to be reviewed by an "independent" cardiologist, it did not ask about, and the cardiologist did not discuss, the impact that "stress" in the workplace might have on Blankenship's condition, the primary reason given by Blankenship's treating physicians for his inability to return to work. Can a heart patient with angina, working under severe stress, be expected to earn up to 60% of what he earned before his heart condition, that is, until he drops dead? Nobody except the completely misinformed or uninformed vocationalist has, in this case, purported to answer this crucially important question. The administrative record reflects that this vocationalist had a copy of the Plan, or was otherwise informed of the 60% of former earnings provision. It is startling to the point of disbelief that the vocationalist, using the precise percentage of earnings set forth in the Plan that would call for a denial, opined that Blankenship could engage in managerial positions similar in nature to his pre-disability occupation. Of course, because the vocationalist was not made aware of crucial facts, it is impossible

to know whether she would have made the same recommendations had she known of Blankenship's heart condition and its relationship to stress. MetLife defends its use of the vocationalist's report by saying that when it submitted the file to said vocational consultant, Blankenship "had recovered from his cardiac condition," and therefore it was unnecessary to inquire about limitations stemming from any cardiac condition. (Def.'s Br. in Opp'n at 9). MetLife's subsequent submission of Blankenship's file to its cardiologist, Dr. Rosenberg, then, must have been a mere defensive device, and not part of a sincere investigation. MetLife's failure to ask Dr. Rosenberg about the relation of stress to the cardiac condition that Blankenship had "recovered from" was not, in this court's opinion, a harmless omission. Only a few months prior to this peer review, MetLife had received a form filled out by Dr. Rudeseal stating that Blankenship was unable to return to work because he "can't handle stress with [his] heart condition," and another from Dr. Honan stating that Blankenship was permanently unable to perform gainful employment due to "CAD [coronary artery disease] precipitated by stressful situations." (AR – 452, 468). By never asking about how stress relates to Blankenship's heart condition, MetLife steered its "independent" consultants away from the central medical issue. Misdirecting the physicians upon whose opinions MetLife based its denial is the very definition of "arbitrary".

As difficult as it is to assess credibility from a purely written record, the instant record, read in its entirety, including the belated change-of-mind by the Social Security Administration, speaks loudly and clearly to this court. The papers themselves demonstrate that MetLife was arbitrary and capricious in denying Blankenship's claim, even if MetLife could possibly, if impossibly, be thought of as a completely disinterested party. The fact that MetLife was operating under a structural conflict-of-interest is enhanced by the large size of the disputed claim. The conflict not only has called for a careful reading of the words in the record, while keeping in mind who uttered them, but also a reading between the lines, all of which has resolved any doubt this court might have started out with about the effect of MetLife's conflict.

It is equally clear that, under the terms of the LTD plan, MetLife is entitled to offset its LTD obligation by any amount of SSDI that Blankenship has received or will receive. Therefore, Blankenship will be entitled to full benefits under the LTD plan, minus any SSDI he has received or will receive.

An appropriate separate partial final judgment commensurate with these findings and conclusions will be entered.

DONE this 30th day of December, 2009.

WILLIAM M. ACKER, JR.
UNITED STATES DISTRICT JUDGE

27